J-A01041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

K.R.W.,

            v.

J.R.R.,

        Appellant

: IN THE SUPERIOR COURT OF
:       PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 1114 WDA 2016

Appeal from the Order June 23, 2016
in the Court of Common Pleas of Venango County
Civil Division at No(s): 810-2014

BEFORE:   BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:       **FILED APRIL 06, 2017**

J.R.R. (Father) appeals from the June 23, 2016 order granting primary physical and sole legal custody of the parties' minor children to K.R.W. (Mother).  We affirm.

Mother and Father are the biological parents of E.R.R., born in January of 2011, and E.J.R., born in November of 2012 (collectively, the Children).  The parties never married and, for a substantial portion of their time together before the birth of E.R.R., they resided in Allegheny County, Pennsylvania.  The parties' relationship has been tumultuous.  Father has repeatedly accused Mother of drug abuse, while Mother has alleged multiple instances of physical and verbal abuse by Father.  Both parties have sought protection from abuse (PFA) orders against one another and Allegheny County Children, Youth, and Family Services (CYF) was involved with the

_____

*Retired Senior Judge assigned to the Superior Court.

family while they resided in that county. In 2011, E.R.R. was placed temporarily with maternal grandmother before being returned to the parents' care later that year. By order dated January 19, 2012, the parties agreed to share physical custody of E.R.R. in alternating seven day periods.

E.J.R. was born in November of 2012. In June of 2013, Mother left Allegheny County to reside with her parents in Venango County, Pennsylvania. Father continued living in Allegheny County until May of 2014 when he moved to Espyville, Crawford County, where he presently resides. Despite living in different counties, the parties continued their romantic relationship and would stay at each other's home during that parent's period of custody. However, in May of 2014, the parties' romantic relationship came to an end.

> On July 17, 2014, Mother filed, in Venango County, a complaint for custody, an emergency petition for special relief, and a petition for approval of the transfer of the child custody case from Allegheny County to Venango County. The trial court held a hearing on the petitions on July 28, 2014. On August 1, 2014, the trial court entered an interim custody order assuming jurisdiction (in Venango County) over the child custody case. In addition, the trial court's order awarded the parties shared physical custody, despite Father's concerns regarding Mother's history of drug addiction, with the provision that the [C]hildren would reside with their maternal grandmother while in Mother's physical custody. The trial court also awarded Mother and Father shared legal custody, and scheduled an evidentiary hearing for September 12, 2014.

> On December 23, 2014, following two days of hearings, the trial court entered an adjudication and order awarding Mother sole legal custody and primary physical custody of the Children. The trial court further awarded Father partial physical

custody, in accordance with a schedule. The trial court's adjudication and order included the trial court's discussion of its findings related to the sixteen factors ("custody/best interest factors") set forth in [23 Pa.C.S. §] 5328(a) of the Child Custody Act ("the Act").

Father timely filed a notice of appeal, along with a concise statement of [errors] complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)[(i)] and (b), which was docketed at No. 395 WDA 2015. On February 2, 2015, the trial court filed an Opinion pursuant to Pa.R.A.P. 1925(a). However, on March 26, 2015, Father filed a praecipe to withdraw his appeal. This court marked the appeal as discontinued on March 27, 2015.

On March 25, 2015, Father filed in the trial court a petition to modify custody and a petition for special relief. In the petition to modify, Father asserted that Mother had been charged with possession of marijuana and committing a theft with a small child in her presence. Father asserted that he was having difficulty in contacting Mother, that she apparently had moved, and that the [C]hildren were often not with her. Father further alleged that the [C]hildren were at risk, in light of Mother's history of illegal drug use. He requested that the trial court modify the existing December 23, 2014 adjudication and order as to Mother's sole legal and primary physical custody award. In his petition for special relief, Father alleged the same circumstances, and requested that he be awarded primary custody[.] The trial court scheduled a hearing on Father's petitions.

The trial court conducted a hearing on April 28, 2015. On May 4, 2015, the trial court entered its adjudication dismissing Father's petitions. Further, the trial court adopted its December 23, 2014 adjudication and order as its final order in the custody matter. The trial court's adjudication did not include a discussion of the section 5328(a) custody/best interest factors.

***K.R.W. V. J.R.R.***, 136 A.3d 1033 (Pa. Super. 2016) (unpublished

memorandum at 1-3; footnotes and unnecessary capitalization omitted).

Father filed a timely notice of appeal[1] and, on January 19, 2016, a panel of this Court vacated the trial court's May 4, 2015 order and remanded the matter for the court to conduct a new evidentiary hearing and address each of the section 5323(a) custody factors. *Id.* On January 26, 2016, Father filed an application for reargument, which was denied by order dated March 3, 2016. Order *Per Curiam*, 883 WDA 2015, 3/3/2016.

The trial court conducted a custody trial on April 22, 2016 and May 26, 2016. The parties agreed that during this new trial, the court "would not receive any additional testimony relating to the custody dispute at the current hearing predating the December 2014 adjudication, but could refer to and use the transcripts of the 2014 and 2015 hearings." Trial Court Opinion, 6/24/2016, at 3.

On June 24, 2016, the trial court issued findings of fact and entered an order awarding primary physical and sole legal custody of the Children to Mother. The trial court awarded Father partial physical custody of the

---

[1] In the interim, between the May 1, 2015 hearing and this Court's consideration of Father's first appeal, Mother had a child with her boyfriend, J.H. Tragically, that child died of sudden infant death syndrome on December 13, 2015. As a result, Mother sustained what the trial court characterized as "severe emotional trauma" and, ultimately, committed herself to a mental health facility for a period of approximately 6 days in February of 2016. Trial Court Opinion, 6/24/2016, at 3. Testimony regarding Mother's mental health, including the discharge form completed by her treating psychiatrist following her self-commitment, was admitted during the 2016 trial in this matter.

Children for three consecutive weekends out of every four, and three non-consecutive one-week periods in the summer months.

Father timely filed the instant notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), and the trial court filed an opinion.

On appeal, Father asks this Court to consider whether the trial court's decision to award Mother primary custody was in the best interest of the Children. Father's Brief at ix. Specifically, Father sets forth the following issues for our review, which we have reorganized for ease of disposition.

> 1. Was the trial court's finding that Mother would be more cooperative in allowing the Children to have a relationship with [Father] than he would be allowing them to have a relationship with her supported by substantial evidence?
>
> 2. Is the trial court's finding that Mother would better support the Children's educational needs supported by substantial evidence?
>
> 3. Is the trial court's finding that the parties are equally stable supported by substantial evidence?
>
> 4. Is the trial court's finding that the parties have equal abilities to parent with regard to their mental and physical health conditions, as well as their history of drug and alcohol abuse supported by substantial evidence?
>
> 5. Is the trial court's finding that Mother has not used illegal drugs in several years supported by substantial evidence?
>
> 6. Did the trial court properly weigh the current behavior of the parties since the litigation has begun?

*Id.* at ix-x (suggested answers and unnecessary capitalization omitted).

We set forth our well-settled standard of review when considering a child custody order.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015) (citations and quotations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *Id.* (citations and quotations omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a).

> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>>
>> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an

abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of

> unwillingness or inability to cooperate with that party.
>
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Instantly, the learned trial court, Senior Judge H. William White, set forth a thorough analysis of all of the section 5328 factors. **See** Trial Court Opinion, 6/24/2016, at 16-32. It determined that ten factors (2, 4, 5, 8, 9, 11, 12, 14, 15, and 16) were neutral or applied equally to both parents; three factors (2.1, 6, and 7) were not relevant or considered; four factors (1, 3, 10, and 13) weighed exclusively in favor of Mother; and none weighed exclusively in favor of Father.[2] After careful consideration, the trial court concluded that awarding primary physical custody to Father would not be in Children's best interest. On appeal, Father takes issue with several of the trial court's factual findings. According to Father, the trial court abused its

---

[2] While the trial court determined that both parents satisfied the necessary criteria with respect to factors 11 (proximity of the parties' residences) and 12 (ability to care for and make childcare arrangements for the Children), the trial court clearly weighed these factors in favor of Mother. **See** Trial Court Opinion, 6/24/2016, at 26-29. Nonetheless, we include factors 11 and 12 in the list of neutral factors and note that the court's analysis in this regard is not at issue in this appeal.

discretion with respect to subsections 5328(a)(1), (3), (4), (9), (10), (14), and (15). We address these claims sequentially.

## Subsection 5328(a)(1)

Father begins by arguing that the trial court's conclusion with respect to subsection 5328(a)(1) (regarding which party is more likely to encourage contact between the Children and the other parent) is in error. Father's Brief at 29. The trial court held as follows with respect to this subsection.

> On this factor we come down strongly on the side of [Mother]. The proceedings in this court began with a petition for emergency relief filed by [Mother] because [Father] was refusing to allow [Mother] to take the younger child of the parties, [E.J.R.], because he contended that she was not able to care for the [C]hildren. His position all along has been that [Mother] is a drug addict and is not safe with the [C]hildren. The court's finding is that [Mother] has appropriately addressed her drug issues and at the hearing in late 2014 we received testimony from Dr. Kahler that we considered credible and controlling. We do conclude [Mother] has not used illegal drugs since before she admitted herself to drug rehab in 2013. Dr. Kahler confirms that [Mother] has been screened clean during her frequent visits to his office. [Mother] has demonstrated more respect for [Father's] parenting skills than [Father] has demonstrated towards [Mother]. [Mother] has offered frequently to expand [Father's] time with the children. Significantly when [Mother] was hospitalized, she suggested that [Father] should take the [C]hildren and it took him two (2) days to pick up the [C]hildren. Since the late 2014 hearing and adduced in the testimony in the more recent hearings in 2016, [Father] seems more supportive of [Mother's] efforts to parent and has stated that the two of them[,] when they communicate between themselves[,] communicate well. He said it is only when they get close to litigation or close to court dates that she seems to become unwilling to communicate. Hopefully, the conclusion of the

proceedings will allow both parties to be more open with each other.

Trial Court Opinion, 6/24/2016, at 17-18 (unnecessary capitalization omitted). The court also noted that

> [t]he [C]hildren are both always glad to see [Father] at the start of his custody time. There was testimony the [Children] are not always glad to see [Mother] at the start of her custody time. The paternal grandmother, [D.R.], and [Father] testified that at times [E.R.R.] does not want to go with [Mother]. So much so that she has had to chase [E.R.R.] throughout the house as [E.R.R.] hides. This testimony was contradicted by [Mother] and we accept [Mother's] version as credible, that [D.R.] has been seen by [Mother] hugging [E.R.R.] at the time of the exchange and consoling her [by] saying words to the effect, "I don't want you to go, but you have to go." We find that conduct is debilitative of [E.R.R.'s] relationship with [Mother] and certainly inflames the exchange. Both parents should be promoting the bond with the other parent. In this case having the paternal grandmother telling [E.R.R.] she would not have to leave but for the court order or [Mother] … is doing damage and is wrong. We accept [Mother's] testimony on that point.

*Id.* at 5-6.

Finally, the court found significant the fact that Father had turned down repeated offers by Mother of increased periods of custody, stating that "this shows [Mother] is willing to keep [Father] fully engaged and is liberal in terms of allowing him extra time with the [C]hildren," while Father "is, for whatever reason, unwilling to take advantage of any time he could possibly have with the [C]hildren." *Id.* at 10.

After carefully examining the record in this matter, we conclude that the trial court did not abuse its discretion with respect to subsection

5328(a)(1). At the most recent custody trial, Father testified that he and Mother "always" get along; however, he did not believe Mother to be forthcoming about issues concerning the Children. N.T., 4/22/2016, at 59. He indicated that Mother will "hold back" information about the Children "when there's court." *Id.* at 60. Father indicated that he calls the Children every night during Mother's period of custody, and will send Mother text messages, although it is sometimes difficult to reach Mother. *Id.* at 87-90.

Mother testified that she wants the Children to have a good relationship with Father, encourages them to talk with Father on the telephone during her periods of custody, and actively attempts to make custody transitions cooperative for the sake of the Children. N.T., 5/26/2016, at 72-73. Mother indicated that, although Father has expressed interest in attending various events for the Children, including parent-teacher conferences, he will not appear at those events, despite having ample notice of the date, time, and location. *Id.* at 55, 61-62, 72. She indicated that she initiates contact with Father regarding the Children, usually via text message, and that their level of communication had improved between the April 22, 2016 and May 26, 2016 custody hearings. *Id.* at 55.

It is clear the trial court found credible Mother's attempts to ensure that the Children have a positive relationship with Father. In his own

testimony, Father never stated a similar intent. Rather, as is evident by Father's argument as to this subsection, which cites to Mother's drug use in 2011 while the parties were residing in Allegheny County, her 2014 arrest for shoplifting, and her allegedly "abusive relationship" with Mother's boyfriend, J.H., Father's Brief at 29, Father focuses on Mother's alleged unfitness as a parent and fails to address his efforts to encourage and permit contact between Mother and the Children. As discussed further, *infra*, the trial court determined that Mother's mental health, relationship, and addiction issues are under control; thus, it was within the court's discretion to reject Father's argument and find the first factor favored Mother.

## Subsections 5328(a)(3) and (a)(10)

Father next argues that the trial court erred with respect to subsections (a)(3) and (a)(10) in determining that Mother was more likely to support the Children's educational needs. Father's Brief at 30. Father's argument on this point assails Mother's lack of a college degree, lack of employment, and her parenting in general, alleging that "Mother was late getting the Children to school 11 times in one month." *Id.* Father argues that he is more likely to support the Children's educational needs because he holds a welding certificate, is gainfully employed, was the first to enroll the Children in school when the parties were together in 2014, and successfully "transported the [C]hildren to school each day [during that time] with the

help of his mother." *Id.* The trial court addressed the relevant factors as follows.

### 3. The parental duties performed by each party on behalf of the [C]hildren:

Both parents in this case are competent to provide for the needs of the [C]hildren. [Mother], when the parties were together, was more of a parent than [Father]; however, [Father], since the separation of the parties, has been very much involved with the [C]hildren. The credible testimony from [paternal grandmother] is that when he is home and the [C]hildren are in his household that he is the parent and assumes all parental responsibilities. As we noted in December 2014 and we reiterate in this opinion, as to the education needs of the [C]hildren, [Mother] is by far the better parent. As we noted, [Father] had educational issues and dropped out of school in the 7th Grade at age 19.[3] [Father] has since completed his GED with [Mother's] help, but he did testify that when he was testing for the technical welding school that he completed, that it was concluded he had an equivalent 11th [g]rade education. [Father] has in the interim completed a welding school and has also obtained responsible employment using his welding training. However, [Mother] has enrolled the [C]hildren in pre-school and Head Start and has actively participated in both programs, volunteers for those programs and because of her education level, which at this point is some credits short of a bachelor's degree, will be better able to see to the educational needs of the [C]hildren and especially to advocate for their educational needs as parents sometimes are required to do. There was also credible testimony from [Mother] that [Father] … has not been addressing adequately the lazy eye issues as they relate to [E.R.R.] or the speech issues as they relate to [E.J.R.].

* * *

_____

[3] The trial court's recitation of the facts in this regard is somewhat inaccurate. During the 2014 custody trial in this matter, Father testified that he dropped out of school at age 17. N.T., 12/18/2014, at 159-160. Father explained that he completed eighth grade after "a couple [of] years" and was in ninth grade for two years before leaving school. *Id.* He did not successfully complete ninth grade. *Id.* at 160.

**10. Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the [Children]:**

We have already noted the significant differential in skills of the parents in helping the [C]hildren develop educationally. At the prior hearing in late 2014, [Father] did not even know the names of the [C]hildren's doctor. At the hearing in the Spring of 2015, [Father] did not know the name of [E.R.R.'s] pre-school teacher of two (2) years and did not even know the name of the pre-school. His involvement with the pre-school had been at best, minimal. [Mother,] on the other hand[,] volunteers for the pre-school and the Head Start [programs]. [Mother] testified that her family is active in a church. The court received no evidence of any spiritual involvement of [Father's] family. [Mother] is specifically addressing and talked in her testimony substantially about the special needs of each of the [C]hildren. [E.R.R.] has a lazy eye, which requires certain exercises, which she contended [Father] was not carrying out when [E.R.R.] was with him. We did not hear that testimony rebutted. [Mother] also testified about the speech needs of [E.J.R.] and what she has done with the providers to assure that [E.J.R.'s] speech issues are being addressed. In making this finding we do not want to denigrate [Father], because [Father] at this time is working fulltime at a new job and clearly has a strong interest in seeing to the needs of the [C]hildren and we would want to maximize his time with the [C]hildren, but we are convinced that [Mother] provides a more nurturing, stable environment and is especially stronger in the educational needs of the [C]hildren.

Trial Court Opinion, 6/24/2016, at 20-22, 25-26.

The court also addressed Father's contention that, because Mother was late getting E.R.R. to preschool 11 times in April of 2016, the evidence suggested she did not prioritize the Children's education.

[Mother], in her testimony, explained that she was perhaps sometimes five minutes late and that the school had not stressed that [E.R.R.] be there on time. We do not put much weight on the fact that [Mother] was late for preschool. [Mother]

told us that [E.R.R.] is a slow eater and she was unaware of any pressure for [E.R.R.] to be on time. [Mother] suggested, at most, she was five minutes late. The point is [E.R.R.] was there every day and has benefitted from her preschool experience.

*Id.* at 12.

Thus, in spite of Father's argument to the contrary, the trial court reiterated its prior finding that "[Mother], of the two parents … is much more aggressive in involving herself in the educational needs of the children." *Id.* at 7.

The trial court's conclusions with respect to subsections 5328(a)(3) and (a)(10) are supported by the record. Mother testified at length regarding the Children's education. N.T., 5/26/2016, at 58-66. She explained that, at the time of the 2016 custody trial, E.R.R. was attending pre-school five days a week, was registered for kindergarten, and was enrolled in a summer program designed to allow her to become acclimated to her classroom before kindergarten begins. *Id.* at 58-59. E.J.R. was enrolled in a Head Start program five days a week and was receiving speech therapy. *Id.* at 64-65. In the fall of 2016, E.J.R. was scheduled to transfer to the same program as his sister. *Id.* at 66. Mother testified that she has a driver's license and a vehicle and would be providing transportation for the Children. *Id.* at 59-60. Mother indicated that she shares all of the Children's school information with Father, and invited Father to E.R.R.'s parent-teacher conference, although he did not attend. *Id.* at 61. Further, Mother stated

that both children have done well in school, although their attendance suffered while they were in Father's care during the time Mother was hospitalized. *Id.* at 61, 65.

On cross-examination, Mother acknowledged that E.J.R. had missed school in the spring of 2016 due to illness, and that illness, coupled with unforeseen delays such as accidentally leaving her vehicle's lights on, resulted in E.R.R. being late to pre-school 11 times in April of 2016. *Id.* at 108. Mother explained that, while school begins at 9:00, there is no rule that the children be there by that time. *Id.* at 118. A report from E.R.R.'s school indicated that often E.R.R. was approximately five minutes late for school which made her miss the school-provided breakfast, although Mother testified that E.R.R. eats her breakfast at home. *Id.* at 108, 118-119.

Father testified that if the court awarded him custody, he expected that the [C]hildren would attend the local elementary school and Head Start program; however, on cross-examination, Father admitted that he had taken no steps to register the [C]hildren in either school. N.T., 4/22/2016, at 47-50. Father indicated that he believed E.J.R. was "on a waitlist from last year" but was unsure whether there were openings available for the 2016-2017 school year, was uncertain as to which program he was on a waitlist, and did not know which days or times E.J.R. would attend school, if registered. *Id.* at 48-49.

With respect to the Children's current education, Father testified that Mother does not inform him of the Children's school activities or medical appointments, but admitted that he does not seek that information out or contact the schools on his own. *Id.* at 51. Father testified that he does not know the name of E.R.R.'s teacher, has not contacted her school with any academic concerns, nor does he volunteer at the school. *Id.* at 54, 63. Further, while Father acknowledged that E.J.R.'s speech was improving with therapy, he testified that he believed the [C]hildren were performing better academically while in his care. *Id.* at 55, 62-63.

We recognize that, going into the 2016 custody trial, Father's periods of custody occurred over weekends. Further, we acknowledge that Father lives in Crawford County, works full time, has a suspended driver's license,[4] and the [C]hildren go to school in Venango County. We also take note of the eleven mornings Mother was late getting E.R.R. to preschool in April of 2016. However, for all of Father's initial efforts with respect to the Children's education, we find no fault with the trial court's determination that Mother is presently in a better position to support their educational needs.

**Subsections 5328(a)(4) and (a)(9)**

---

[4] Father's driver's license has been suspended until 2018 as a result of a driving under the influence (DUI) conviction. Trial Court Opinion, 6/24/2016, at 10.

The trial court determined that, with respect to subsections 5328(a)(4) and (a)(9), the parties were equally capable of providing stability, consistency, and nurturing to the Children's lives. Father challenges this determination, arguing that he is the more stable parent. Specifically, he alleges that, since custody proceedings began in 2014, "Mother has moved twice, been arrested twice and [pled] guilty to retail theft and has begun and ended a relationship and restarted a relationship and become pregnant with that man's baby, which baby sadly died." Father's Brief at 28. Further, Father takes issue with the trial court's characterization of Mother's family as supportive and the court's alleged dismissal of paternal grandmother's availability and willingness to assist Father in his parental duties. *Id.* Finally, Father reiterates his contention that Mother is a drug addict who "used drugs and alcohol with her father" before the Children were born. *Id.*

The trial court addressed the factors outlined in subsections (a)(4) and (a)(9) as follows.

### 4. The need for stability and continuity in the [Children's] education, family life and community life:

Both [C]hildren at this time are enrolled in Head Start and pre-school in Oil City by [Mother]. [Father] has been living for a substantial period of time with his parents; it is likely that at such time as he becomes more stable he will seek independent living arrangements. [Mother] has been living with her parents principally since she and [Father] separated; however, on two separate occasions she has moved out and stayed with her significant other [J.H.]. [Mother] has testified that she did not stay with [J.H.] and is not moving in with [J.H.] because their

relationship, while it is that of a boyfriend/girlfriend, is not conducive to living together.

**9. Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the [Children] adequate for the [Children's] emotional needs:**

We conclude we have two competent parents in this case. [Mother] because of her education and experience in more directly dealing with the [C]hildren's needs up to now is the more steady, consistent and nurturing of the two parents. In the absence of [Mother, Father] is a competent parent and certainly exercises diligence in parenting the [C]hildren.

Trial Court Opinion, 6/24/2016, at 22, 25.

Additionally, the court addressed Father's contention that Mother's change in address was demonstrative of her instability.

Mother did move in with [J.H.] for two weeks in 2015, and then [Mother] returned to live with her parents. [Mother] lived with [J.H.] one other time prior to the 2014 hearings, and [after] that instance also returned to her parents' home. This issue could be a factor two different ways. It arguably would show instability. What it demonstrates, we contend, is [Mother] is being extremely cautious in entering a permanent relationship with anyone, and that, perhaps, is the responsible thing since she is responsible for two children. However, [Mother] says that she and [J.H.] have a good boyfriend/girlfriend relationship and that the relationship is progressing. We do not view the fact that she lived for two weeks with [J.H.] in 2015 as demonstrating lack of consistency with living arrangements.

*Id.* at 11-14.

Finally, with respect to subsections (a)(4) and (a)(9), the trial court explained its concern about Father's DUI-suspended driver's license. The court noted that although Father testified that he "[n]ever drives when the [C]hildren are in the car," the clear inference drawn from that testimony is

that Father is operating a vehicle illegally which "puts him on the wrong side of the law." *Id.* at 10. The court indicted that it respected "[Father's] desire to work and provide sustenance for his family. On the other hand, he still is making a conscious decision to drive illegally without a license, DUI related." *Id.* at 11. The court noted that Mother had a valid driver's license and access to a vehicle.

Once more, the trial court's findings are supported by the record and we discern no abuse of discretion in the trial court's conclusions with respect to the parents' relative stability. Despite Father's protestations to the contrary, the home life of Mother has remained unchanged since 2015. She has been a staunch supporter of the Children's education, plans to seek the degree and employment Father suggests is essential to her stability, and has addressed the mental health issues underlying the loss of her child with J.H. Critically, there was no evidence presented during the custody proceedings which would suggest that Mother's relationship with J.H. is likely to end, or is in some way detrimental to the Children. To the contrary, the trial court found that J.H. is "a positive influence" for the Children and Mother. *Id*. at 5. Moreover, of the two parents, Mother has the more reliable access to transportation for the Children. Father's suggestion that Mother's home life is unstable is mere speculation, and does not warrant reversal of the subject custody order.

## Subsections 5328(a)(14) and (a)(15)

Father next contends that the trial court erred in determining that the parties have equal abilities to parent in light of their respective mental and physical health and drug- and alcohol-related issues. Father's Brief at 27. Focusing on testimony from the December 2014 hearings, Father contends that Mother is a drug and alcohol addict, prone to relapse, and implies that J.H. is not living with her due to her continued drug use. *Id.* at 24-25. Father alleges that Mother's testimony regarding her sobriety and mental health is not credible. *Id.*

The trial court found as follows.

**14. The history of drug or alcohol abuse of a party or member of a party's household:**

We have already discussed that at some length; both parents have drug and alcohol issues, [and] both parents at this time are addressing those issues to the satisfaction of the court and certainly as well as could be handled.

**15. The mental and physical condition of a party or member of a party's household:**

[Mother] went through an incredibly straining period in late 2015; she had given birth to a child and lost the child after about a month to sudden infant death syndrome. [Mother] we conclude handled this about as well as a parent could be expected to handle such a painful, traumatic event. At some point in February 2016, [Mother] did commit herself to a mental health facility to receive more structured and aggressive treatment to deal with her depression. [Mother] testified credibly that she has not used Suboxone[5], even though legally prescribed, since the

---

[5] Suboxone is a prescription medication that is used to treat persons addicted to opioids, both prescription and illegal.

death of her infant. [Mother] had been in a Suboxone program for her drug addiction. [Mother] is not, we find, using illegal drugs; however, [Mother] is receiving substantial psychotropic [medications] that were prescribed during and then immediately after[] her stay in the hospital. We respect the fact [Mother] took it upon herself to admit herself and received concentrated care and comprehensive diagnosis and treatment. [Mother] has followed through; she was required to see a psychiatrist in Meadville, which she did. The psychiatrist did prescribe her ongoing medications, which are being monitored by her treating primary care physician, Dr. Kahler. [Mother] told us that for her to be on Suboxone or other drugs of that type would be detrimental to the drugs that were prescribed by the psychiatrist. We find [Mother] handled the death of her child as responsively [(*sic*)] as one could expect. The tragedy had no ostensible impact on [the Children], in fact, [Mother], went ahead with the birthday party for [E.R.R.] shortly after the death of her child[.]

Trial Court Opinion, 6/24/2016, at 30-32.

The court elaborated further,

[Mother] at this time is on [a program of Accelerated Rehabilitative Disposition (ARD)], pursuant to Criminal Procedure Rule No. 310. The [c]ourt notes that ARD is not an admission of misconduct. Mother is paying court costs and is continuing her substance abuse programming consistent with what she has been doing all along. The ARD was for the marijuana possession and the retail theft, which were the subject of the April 2015 modification hearing.

*Id.* at 15.

Father's allegation that Mother has failed to address entirely her addiction and mental health issues is speculative at best. It is clear from the testimony presented here that both parties have struggled with drug and

- 22 -

alcohol use.[6] However, the trial court found credible Mother's testimony that she is abstaining from illegal drugs and Suboxone, seeking treatment for her mental health issues, and has completed her court-ordered ARD requirements. N.T., 5/26/2016, at 48-51, 75-79. Further, the court considered and accepted the testimony of Mother's grief and loss counselor, Janet Schwabenbauer, that Mother appears to be "committed to getting though" her loss and is "fully engaged" with her mental health treatment, *id.* at 6-9, as well as the testimony of the Children's maternal grandmother that she does not believe Mother to be under the influence of illegal drugs, although she has observed Mother "have a drink from time to time." *Id.* at 20.

While we have reservations with regard to the trial court's evaluation of subsections 5328(a)(14) and (a)(15), particularly considering Mother's history of drug and alcohol abuse and Father's continual violation of his DUI-related license suspension, we agree with the court's conclusion that this factor does not weigh in favor of either parent. Accordingly, we see no reason to disturb the trial court's determinations as to subsections 5328(a)(14) and (a)(15). *R.M. v. J.S.,* 20 A.3d 496, 506 n. 8 (Pa. Super. 2011) (citation omitted) (holding that, "[i]f we determine that the trial court ruling is correct, we can affirm on any basis supported by the record.").

---

[6] Additionally, for all of Father's emphasis on Mother's prior acts, he makes no argument to refute the trial court's concerns regarding his decision to flout the law by driving on a DUI-related suspended license.

**Weight of the Custody Factors**

In his final issue, Father argues that the trial court erred in how it weighed the parties' behavior since the litigation began in 2014. Father's Brief at 31. Father reiterates his earlier claims that Mother has unresolved addiction, mental health, and legal issues, contends that her living situation is unstable and argues that Mother has not demonstrated a proven ability to "get things done with and for" the Children. *Id.* By contrast, Father argues, he has a proven record of stability and dedication to the Children; thus, the court erred in failing to grant him full custody. *Id.* at 32. Our standard of review makes clear that "with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." ***D.K. v. S.P.K.***, 102 A.3d 467, 479 (Pa. Super. 2014) (quotation and citation omitted). Thus, we will not disturb the court's well-reasoned findings, nor will we reweigh the evidence in Father's favor. Accordingly, we hold that Father is not entitled to relief on this issue.

In sum, we conclude that there is substantial evidence supporting the findings that the trial court reached on each factor of section 5328(a) that Father challenges. As a result, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  4/6/2017